1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8
KATHRYN LOUISE TATE,
9
          Plaintiff,                          No. C 08-0188 PJH
10
          v.                                  **ORDER RE PLAINTIFF'S MOTION**
11                                            **FOR SUMMARY JUDGMENT AND**
MICHAEL J. ASTRUE, Commissioner               **DEFENDANT'S CROSS-MOTION**
12   of Social Security,                        **FOR SUMMARY JUDGMENT**
13          Defendant.
_____/
14

15          Plaintiff Kathryn Tate ("Tate") seeks judicial review of the decision by the Social

16   Security Administration Commissioner ("Commissioner") denying her claim for disability

17   benefits pursuant to 42 U.S.C. § 405(g).  This action is before the court on Tate's motion for

18   summary judgment, and the Commissioner's cross-motion for summary judgment.  Having

19   read the parties' papers and administrative record, and having carefully considered their

20   arguments and the relevant legal authority, the court DENIES the Commissioner's cross-

21   motion for summary judgment, GRANTS Tate's motion for summary judgment, and

22   REMANDS the case in accordance with this order.

23                              **BACKGROUND**

24          **A.      Procedural Background**

25          On August 8, 2005, Tate filed applications for a period of disability, disability

26   insurance benefits (DIB), and disabled adult child's benefits on the earnings record of her

27   deceased father (CIB).  At the time that Tate filed her application, she was forty-five years

28   old, and was already receiving supplemental security income (SSI).  She had applied for

1   SSI approximately fifteen years before, on November 21, 1990, alleging an onset date of
2   May 11, 1982.  Her claim, however, was granted with an onset date of November 1, 1990,
3   because SSI benefits are not retroactive.

4        In her August 2005 applications for DIB and CIB, Tate argued that the applications
5   should actually have been taken by the Commissioner in November 1990, at the same time
6   she applied for SSI benefits.  The Commissioner agreed, and accepted Tate's applications
7   with a November 21, 1990 filing date, and an alleged onset date of May 11, 1982.  The
8   Commissioner denied Tate's application initially and on reconsideration.  On March 26,
9   2007, an ALJ held a hearing at which Tate, Tate's sister, Beth Tate (hereinafter "Beth"),
10  and a medical expert ("ME") testified.  On April 24, 2007, the ALJ rendered an unfavorable
11  decision.  Tate then requested review by the Appeals Council, which denied her request for
12  review.   On January 10, 2008, Tate brought this action seeking judicial review of the ALJ's
13  decision pursuant to 42 U.S.C. § 405(g).

14  **B.    Factual Background**

15       There were several issues before the ALJ, but the only issue on appeal concerns
16  whether or not Tate was disabled at any time during the period from May 11, 1982, her
17  alleged onset date, to March 30, 1987.  The ALJ noted, and both parties agree that in order
18  to establish eligibility for DIB, Tate was required to show that she became disabled on or
19  before March 30, 1987.  Similarly, in order to establish eligibility for CIB, Tate was required
20  to demonstrate that she became disabled on or before August 29, 1982.

21       Tate was born August 19, 1960.  The earliest medical records introduced by Tate
22  were from 1989; accordingly there were no medical records from 1987 or before.  However,
23  both Tate and her sister, Beth, testified that Tate suffered from mental illness prior to 1987.
24  Beth testified that her younger sister suffered from mental illness her entire life.
25  Administrative Record ("A.R.") at 448.  She asserted that Tate's "problems" first became
26  obvious when she was in elementary school.

27       Both Beth and Tate testified that Tate first attempted suicide in approximately 1975,
28  when she was fifteen years-old.  Tate intravenously shot ammonia in her veins using shots

1   that belonged to her mother.  Her father took her to the hospital, where she was treated

2   and released.  Tate testified that her family dismissed the incident as "nonsense."  *Id.* at

3   434.  Her sister testified that Tate was referred to a therapist after the incident, but that she

4   didn't like the therapist and refused any further treatment.  Beth also testified that her

5   parents were very "old school" and did not believe in therapy, which may be one reason

6   that Tate did not get treatment at the time.  *Id.* at 444.

7         Beth testified that in or around 1979 or 1980, Tate was diagnosed as bipolar.  *Id.*

8   She had a strange episode around the holidays, and she was taken to a doctor who put her

9   on lithium, which apparently did not help, and which Tate ultimately discontinued.

10  Subsequently, in 1981, Tate again attempted suicide, this time by slitting her wrists.  *Id.*

11  Over the course of the next few years, Tate also had a nervous breakdown, and ended up

12  in a hospital in Baltimore, at which point she was treated with anti-anxiety medication.  She

13  continued treatment at Johns Hopkins in Baltimore for several years.

14        As noted, the above is based on the testimony of Tate and Beth.  The record,

15  however, contains medical records from 1989 until the present.  Those records

16  demonstrate that since 1987, Tate attempted suicide for the third time; has been

17  hospitalized on several occasions; has been treated regularly by several psychiatrists; has

18  again been diagnosed with bipolar disorder; has also since been diagnosed with schizo

19  affective disorder; and has been treated with numerous anti-anxiety and anti-psychotic

20  medications, several of which she was taking at the time of the 2007 hearing.

21                 **STATUTORY AND REGULATORY FRAMEWORK**

22        The Social Security Act ("the Act") provides for the payment of disability insurance

23  benefits to people who have contributed to the Social Security system and who suffer from

24  a physical or mental disability.  *See* 42 U.S.C. § 423 (a)(1).  To evaluate whether a claimant

25  is disabled within the meaning of the Act, the ALJ must use a five-step analysis.  20 C.F.R.

26  § 404.1520.  The ALJ may terminate the analysis at any stage where a decision can be

27  made that the claimant is or is not disabled.  *See Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th

28  Cir. 1990).

3

1    At step one, the ALJ determines whether the claimant is engaged in any "substantial

2   gainful activity," which would automatically preclude the claimant from receiving disability

3   benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(I).  If not, at the second step, the ALJ must

4   consider whether the claimant suffers from a severe impairment which "significantly limits

5   [the claimant's] physical or mental ability to do basic work activities."  *See* 20 C.F.R. §

6   404.1520(a)(4)(ii).  The third step requires the ALJ to compare the claimant's impairment to

7   a listing of impairments in the regulations.  If the claimant's impairment or combination of

8   impairments meets or equals the severity of any medical condition contained in the listing,

9   the claimant is presumed disabled and is awarded benefits.  *See* 20 C.F.R. §

10  404.1520(a)(4)(iii).

11    If the claimant's condition does not meet or equal a listing, the ALJ must proceed to

12  step four to consider whether the claimant has sufficient "residual functional capacity"

13  ("RFC") to perform her past work despite the limitations caused by the impairment.  *See* 20

14  C.F.R. § 404.1520(a)(4)(iv).  If the claimant cannot perform her past work, the

15  Commissioner is required to show, at step five, that the claimant can perform other work

16  that exists in significant numbers in the national economy, taking into consideration the

17  claimant's "residual functional capacity, age, education, and past work experience."  *See* 20

18  C.F.R. § 404.1520(a)(4)(v).

19    Overall, in steps one through four, the claimant has the burden to demonstrate a

20  severe impairment and an inability to engage in his previous occupation.  *Andrews v.*

21  *Shahala*, 53 F.3d 1035, 1040 (9th Cir. 1995).  If the analysis proceeds to step five, the

22  burden shifts to the Commissioner to demonstrate that the claimant can perform other

23  work.  *Id.*

**ALJ FINDINGS**

25    At step one, the ALJ concluded that Tate did not engage in substantial gainful

26  activity from the period of her alleged onset date of May 11, 1982 through March 30, 1987.

27  However, the ALJ determined that Tate was not disabled prior to or as of March 30, 1987,

28  at step two of the disability evaluation.

4

1    At step two, the ALJ summarized Tate's and her sister's testimony regarding that

2  period.  The ALJ noted that prior to November 1989, there was "no objective medical

3  evidence that [Tate] received treatment or was taking medication."  *Id.*  He stated that the

4  ME testified "that prior to March 31, 1987, it was difficult to tell how severe [Tate's]

5  impairment was."  A.R. 28.   The ALJ then found that given the lack of medical evidence,

6  Tate's and her sister's testimony could not be found to be entirely credible.  He ultimately

7  concluded that "the objective medical evidence contained in the record does not establish

8  the existence of a medically determinable impairment through the date last insured that

9  could have reasonably been expected to produce the claimant's symptoms."  A.R. 29.

10                               **STANDARD OF REVIEW**

11    This court has jurisdiction to review final decisions of the Commissioner pursuant to

12  42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the ALJ's findings are

13  "supported by substantial evidence and if the [ALJ] applied the correct legal standards."

14  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001).  "Substantial evidence" means

15  more than a scintilla, but less than a preponderance, or evidence which a reasonable

16  person might accept as adequate to support a conclusion.  *Thomas v. Barnhart*, 278 F.3d

17  947, 954 (9th Cir. 2002).  The court is required to review the administrative record as a

18  whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.

19  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  Where the evidence is

20  susceptible to more than one rational interpretation, the court must uphold the ALJ's

21  decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

22    When the Appeals Council denies review after evaluating the entire record, including

23  newly submitted evidence, that new evidence becomes a part of the administrative record

24  to be reviewed by this court on appeal.  *See Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th

25  Cir. 1993).  Thus, this court must consider the evidence before both the ALJ and the

26  Appeals Council in reviewing the ALJ's decision.  *Id.*

27  ////

28

**DISCUSSION**

Tate argues that the ALJ mischaracterized the ME's testimony and improperly disregarded her testimony and that of her sister. She further argues that the ALJ failed to utilize the ME correctly.

In response, the Commissioner does not address the ALJ's characterization of the ME, or even his use of the ME, but instead argues that the ALJ properly terminated the inquiry at step two based on the absence of medical records establishing a severe impairment during the relevant time period. The Commissioner further contends that, given the lack of medical evidence, the ALJ was not required to address Tate's or her sister's "subjective" testimony regarding Tate's symptoms during the periods in question, thus implying that any improper rejection of the testimony was harmless error.

Tate is correct that the ALJ misconstrued the ME's testimony in this case. The hearing transcripts reflect that both the ALJ and the ME were somewhat confused regarding the scope of testimony required from the ME under the circumstances of this case. See A.R. at 453-454.

As noted above, there were issues other than the May 11, 1982 - March 30, 1987 period before the ALJ. One of those concerned whether Tate continued to suffer from a disability after 1998, the date when her SSI benefits were suspended. Given the multiple issues, the evidence and testimony spanned the period from Tate's childhood until the present. The ME noted his confusion before the ALJ, asserting:

> Judge, I'm a little confused on what I'm being asked to evaluate. From 1980 to 1987, is that what I'm being asked to evaluate, or am I being asked to evaluate from the time of the cessation of [of SSI benefits in October 1998] until present?

*Id.* at 453.  In response, the ALJ stated:

> You know, it's a good question. I'm going to almost have to procedurally work this out. I guess I'm asking you to offer your professional opinion on the nature of her impairment based on the testimony, the extent of it, because what — let me see if I can help you here a little bit more. . .

*Id.*  The ME then clarified that he was having difficulty proffering an opinion regarding the period from 1980 until 1987 because other than testimony, there wasn't really any evidence

since medical records were not available.  *Id.* at 454.  The ME noted that if that period

wasn't important, he didn't want to "belabor" it.  *Id.*  He noted that, on the other hand, he

was "certainly" able to render an opinion from the period 1998 onward, and that *that* issue

was actually "fairly straightforward."  *Id.*

The ALJ responded that he was "going to divide it into two parts," stating:

> I'm going to put you [the ME] on the spot.  I'm going to have to get your
> testimony regardless of what it is in terms of records or anything, and you can
> weigh in on it – on whether or not [Tate] was disabled before her date last
> insured of March 31, 1987.  So, I need an opinion on that.

*Id.* at 455.

The ME subsequently stated that it was his opinion that as of 1998, Tate satisfied

the social security listings and could thus be presumed disabled based on her schizoid

effective disorder, which was diagnosed after 1987.  *Id.* at 458-59.

However, as for the period prior to 1987, the ME was less certain given the lack of

medical evidence.  *Id.* at 455.  Accordingly, the ME posed a couple of additional questions

to Tate's sister, Beth.  One of those questions was whether or not Tate had been

hospitalized in 1987 or before.  *Id.* at 452.  The sister testified that Tate was hospitalized for

a couple of days in 1986 or 1987 when she was feeling suicidal after their father passed

away.  *Id.*  She testified that as soon as family members arrived at the hospital, Tate "felt

better" and "checked herself out."  *Id.*

The ME also asked Tate's sister how Tate "survived in the 1980's."  *Id.* at 456.  The

sister testified that Tate survived on financial assistance from her family and boyfriends.  *Id.*

She noted that their mother paid Tate's rent, and that Tate's boyfriends provided her with

food, and she and other siblings also helped Tate out with money.  *Id.*  Beth testified that by

1990, their mother was "running out of money," and implied that was in part because of

how much money she'd been giving to Tate.  *Id.* at 452-53.  Beth stated that at that point,

the family decided "that's it," and that there was something seriously wrong with Tate and

that something had to be done.  *Id.*  That apparently was around the time at which they

helped Tate apply for SSI benefits in 1990.

7

1    The ME found that as for the "1980's through '87 or whatever it is, . . . it's really

2 impossible to tell how severe [Tate's] symptoms were," and stated that was why he asked

3 her sister regarding hospitalization.  *Id.* at 459-60.  He explained

4         [T]hat's why I was asking about hospitalization.  Generally, someone who's
          symptoms are extremely unstable, they burn up relationships, and inevitably
5         have to be hospitalized.  Someone with less severe symptoms, particularly if
          they're bright and articulate, often times can live on the margins, be supported
6         by various people.

7 *Id.* at 460.

8    The ME implied that "the problem" was that prior to 1990, Tate's "denial was much

9 stronger, and there was no willingness or capacity to really interact in an ongoing way with

10 treatment."  *Id.*  He then noted that treatment has actually improved significantly since the

11 1980's, such that "avoiding the system may have been actually, to some extent, in [Tate's]

12 best interest during those times, those early years."  *Id.*  The ME then concluded that

13        That said, there really isn't sufficient evidence, even in the testimony, for me
          to be able to say *that [Tate] met or equaled a listing during the '80s,* prior to
14        when the record began in '89, November of '89, at L.A. County, some kind of
          mental health clinic in LA.
15

16 *Id.* (emphasis added).

17    In his decision, the ALJ however misconstrued the ME's opinion to be that Tate

18 lacked a severe impairment prior to 1987, such that he could terminate the inquiry at step

19 two.  That, however, was not the case.  Instead, the ME found that as of 1998, Tate was

20 severely impaired by schizoid affective disorder, and that the impairment met the listing

21 such that she could be presumed disabled.  The ME, however, did not make any findings

22 regarding the onset date of Tate's severe impairment, and, more specifically, regarding

23 whether or not its onset dated back to 1987.  Nor did the ALJ query the ME regarding the

24 onset date of Tate's schizoid affective disorder.  Instead, the ME concluded that unlike the

25 post-1998 period, because of the lack of medical evidence, he could not opine that Tate

26 satisfied the listings prior as of 1987 such that she could be presumed disabled from 1982-

27 1987.  That, however, is a determination that occurs at step three of the analysis, and *not*

28 at step two, as construed by the ALJ.  Because it occurs at step three, it is also one that

8

1  does not terminate the inquiry under the guidelines.  Instead, as set forth above, if a

2  claimant cannot be presumed disabled at step three because she does not satisfy the

3  listings, the ALJ must nevertheless proceed to step four to consider whether the claimant

4  has sufficient RFC to perform her past work despite the limitations caused by her

5  impairment.  Because the ALJ misconstrued the ME's testimony and prematurely

6  discontinued the inquiry at step two, he did not reach step four, or even step five, to the

7  extent that it was necessary.

8          Additionally, because the ALJ overlooked the fact  that the ME necessarily found

9  that Tate suffered from a severe impairment at step two of the inquiry, this case is

10  distinguishable from the case relied on by the Commissioner.  In *Ukolov v. Barnhart,* the

11  Ninth Circuit relied on Social Security Ruling (SSR) 96-4p[1] in holding that an individual must

12  be found not disabled at step two "where there are no [objective] medical signs or

13  laboratory findings to substantiate the existence of a medically determinable physical or

14  mental impairment."  420 F.3d 1002, 1005 (9th Cir. 2005).  This is the case "regardless of

15  how many symptoms an individual alleges, or how genuine the individual's complaints

16  appear to be."  *Id.*  The *Ukolov* court found there was no such medical evidence in that

17  case, and that the ALJ was justified in determining that the plaintiff was not disabled at step

18  two in spite of the plaintiff's testimony to the contrary.  *Id.*

19          Here, unlike *Ukolov*, the ME testified that it was "certain" and "straightforward" based

20  on the objective medical evidence that in 1998, Tate suffered from a severe, medically

21  determinable impairment - schizoid affective disorder.  Given this finding, the real issue is

22  the onset date of that impairment, an issue that the ME did not address.

23          The ALJ in this case erred when he did not query the ME regarding the onset date,

24  but instead inferred in his decision, based on the dates of Tate's medical treatment, that the

25  onset date of Tate's "severe impairment" could not have been prior to March 30, 1987

26  because there were no objective medical records documenting such an onset date.  It is

27  _____

28          [1]Social Security Rulings "are binding on all components of the administration."  *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990).

9

1  well-established law in the Ninth Circuit, though, that the onset date may not simply be

2  equated with the date of diagnosis, and that it is the onset date and *not* the date of

3  diagnosis that is "critical."  *See Swanson v. Secretary of Health & Human Servs.*, 763 F.2d

4  1061, 1065-66 (9th Cir. 1985); *see also Morgan v. Sullivan*, 945 F.2d 1079, 1081 (9th Cir.

5  1991). This is especially true for mental impairments, which unlike many physical

6  impairments, are progressive in nature and whose onset dates may be elusive.  *See*

7  *Morgan*, 945 F.2d at 1081.

8          The Ninth Circuit has endorsed SSR 83-20, which provides in pertinent part with

9  respect to mental impairments:

10         With slowly progressive impairments, it is sometimes impossible to obtain
           medical evidence establishing the precise date an impairment became
11         disabling.  Determining the proper onset date is particularly difficult, when, for
           example, the alleged onset and the date last worked are far in the past and
12         adequate medical records are not available.  In such cases, it will be
           necessary to infer the onset date from the medical and other evidence that
13         describe the history and symptomology of the diseases process.

14         . . . .

15         In some cases it may be possible, based on the medical evidence to
           reasonably infer that the onset of a disabling impairment(s) occurred some
16         time prior to the date of the first recorded medical examination, e.g., the date
           the claimant stopped working.  How long the disease may be determined to
17         have existed at a disabling level of severity depends on an informed judgment
           of the facts in a particular case.  This judgment, however, must have a
18         legitimate medical basis.  At the hearing, the administrative law judge should
           call on the services of a medical advisor when onset must be inferred.

19

20  *See Armstrong v. Commissioner*, 160 F.3d 587, 589-90 (9th Cir. 1998) (ALJ's failure to call

21  medical expert before inferring an onset date where the record was unclear was reversible

22  error)*; see also Morgan*, 945 F.2d at 1082; *DeLorme v. Sullivan*, 924 F.2d 841, 848-49 (9th

23  Cir. 1991). The Ninth Circuit has held, based on SSR 83-20, that where medical inferences

24  regarding the onset date need to be made, the ALJ *must* consult a medical expert before

25  determining the onset date.  *See Armstrong*, 160 F.3d at 590*; Morgan,* 945 F.2d at 1082.

26         Here, it is possible that the ME would have opined that Tate's likely onset date

27  preceded 1987, but then consistent with his existing findings, determined that unlike the

28  post-1998 period, he was unable to determine whether or not the impairment would have

1   satisfied the listings at step three of the analysis.  This still would have required that the

2   ALJ proceed to step four and perhaps even step five of the analysis.

3       On remand, the ALJ is required to obtain the ME's opinion regarding the onset date

4   of Tate's schizoid affective disorder.  If the ME concludes that the onset date was March

5   30, 1987 or earlier, then the ALJ will need to proceed to steps four and, if necessary, five of

6   the analysis.  Additionally, on remand, the ALJ should afford both Tate's and her sister's

7   testimony the appropriate weight in determining the onset date of Tate's schizoid affective

8   disorder.  *See Delorme*, 924 F.2d at 848 (noting that "onset of disability may sometimes be

9   found at a time considerably in advance of [hospitalization], and that "[i]t is not unusual for

10  the [claimant's] history to show that prior to hospitalization the person manifested

11  personality changes such as refusing to go out of the house, refusing to eat, accusing

12  others of being against him or her, threatening family and neighbors, etc").

13                              **CONCLUSION**

14      For the above reasons, the court GRANTS Tate's motion for summary judgment,

15  DENIES the Commissioner's cross-motion for summary judgment, and REMANDS the

16  case for further proceedings in accordance with the directions above.

17      This order fully adjudicates the motions listed at numbers sixteen and twenty-two of

18  the clerk's docket for this case.  The clerk shall close the file.

19

20  **IT IS SO ORDERED.**

21  Dated: January 14, 2009

22                              _____
                                PHYLLIS J. HAMILTON
23                              United States District Judge

24

25

26

27

28

                                11